docket number 145027. Mr. Madden, I understand that you want to reserve three minutes for rebuttal? That's correct, Your Honor. Okay. You may begin. Thank you. May it please the court? Good morning, Your Honor. Raj Madden, Skadden Arps for the appellant. I thought I'd start this morning with three foundational points before we get into the substance of the discussion. And the first point is that this appeal turns on a legal question. Specifically, the question is how the court should characterize as a matter of law, Barclay's payments to BB&T of approximately $60 million a year, which we referred to and the parties referred to at the time as BX payments. More specifically, the question is whether those BX payments should be treated as economic income to BB&T as a matter of law. BB&T, for purposes of this appeal, does not dispute any of the facts down below on the question of the merits of its entitlement to the foreign tax credits and the loan interest deduction. Specifically, there's no... I'll let you get to the next two points so that we know that, but are you saying that the characterization of the BX payments would in and of itself decide the question? Yes. Okay. And your other two points? My other two points are an explanation of why that's the central issue, this characterization of the BX payments. And the third is to clarify what we are and what we're not arguing with respect to economic substance. I want to leave no doubt that what we're not arguing is that BB&T's literal compliance with the statutes at issue, including Internal Revenue Code Section 901I, precludes or preempts the application of the economic substance factor. That is not our argument and I want to make sure that there is not ambiguity on that point. Instead, what our argument in that regard is very consistent with this circuit's precedent, specifically as articulated in Coltec, that the economic substance doctrine is a judicial tool for interpreting the statutes, the applicable statutes and regulations. It is a canon of statutory construction. And our point is that when you look at the applicable statutes here, specifically Section 901I, as it relates to one of the narrow issues associated with economic substance, specifically the question of whether these BX payments should be treated as rebates or effective rebates, 901I informs, significantly informs, the question that the government is posing with respect to economic substance. Now, why is that the case? The reason is that under Section 901I, the first point is that it is the rule that governs when a specific benefit that is conferred by a foreign government to any party in the transaction, Barclays, BB&T, will be considered a so-called rebate. So you are saying that literal compliance may not be sufficient, but we can't examine the broader question of economic substance without at least reference to the statutory provisions. Yes, and in this particular case it is more than just reference to that particular statute, because the inquiry under 901I, in terms of evaluating, assessing, whether this particular BX payment, these BX payments, should be construed as effective rebates, is the same inquiry that the IRS has conducted under economic substance. Specifically, 901I, first of all, requires a substance-based analysis. The applicable regulation says substance, not form, controls, and that's the inquiry. So the filter that's applied with respect to the statute is identical to the filter that's applied under economic substance, which is getting at, let's figure out what the substance of the transaction is. So the question is BB&T pays UK taxes to the United Kingdom. The question is, does any of the benefits that have been conferred to Barclays, and then indirectly from Barclays to BB&T, constitute in substance a rebate of the taxes that BB&T had paid to the United Kingdom? Can I ask you this? If you put this money in a trust and you paid the 22% of the tax, and the agreement said specifically Barclays will receive 11% of the tax paid, would that violate 901? No. That would not violate 901 because that's not the question under 901, 901I specifically. The question under 901I is, let's assume that Barclays, excuse me, BB&T pays, in our example that we've used with the $100 example, pays $22 of tax to the United Kingdom, the trust does. The question that 901 asks is, was that tax, that specific tax somehow rebated or subsidized to Barclays, and then did BB&T confer a benefit from that payment? And the reason that any private party contract that references the specific statute would never run afoul of that statute unless there is proof or the government can establish that the United Kingdom somehow subsidized or rebated the taxes to Barclays. That's the key inquiry. It isn't about the private parties, what Barclays and BB&T decided. The question is, was the tax that BB&T paid of $22 rebated or refunded or reimbursed as the government uses to Barclays? And the answer is no. I'm a little intrigued by your argument here that this is, your position that the economic substance doctrine is a canon of construction, because generally you don't resort to canons of construction unless you think that something about the statute is ambiguous. You're not arguing that 901I is ambiguous, right? That's right. I mean, you say that unambiguously it has to be a rebate from the foreign government. That's right. So how is this, how is the economic substance doctrine then effectively a canon of construction? That's a good question. When I, maybe I should have characterized that differently. My point is that if the Coltec Court in this circuit has already established that at a minimum it is a canon of construction, then certainly you have to start with the statute in order to assess, in this case, whether we have a in-substance rebate. So in this case, we're not, I'm not arguing that you should use the statute to interpret a particular provision. What I am saying is that the statute is the beginning and end of the question. So, so the canon of construction point is that there's no question in this circuit that the statute is highly relevant and that you use the statute in exercising the economic substance doctrine. Okay, so you're not saying it's the beginning and end of the question in the sense that it decides whether or not there's economic substance, but it's the beginning and end of the question as to what it is you're supposed to be looking at. Correct. That's exactly right. And the reason for that is this. The question, the overall economic substance question, as it's been established by this court, is did this transaction present to BB&T a reasonable possibility of profit? That's the objective question. And the reason that this BX question is so important is that if it is treated as profit, economic profit, as we think it should, then there's no question that the trust transaction is profitable to the tune of $60 million. Let me see if I understand. When you say this transaction, are you treating the trust portion of the overall transaction as discrete from the loan portion? Are you treating the loan and the trust as a single, this transaction? Yes. For purposes of this appeal, we are treating the trust transaction as separate and distinct from the loan transaction. Okay, so when you just mentioned this transaction, you were focusing on the trust aspect of the overall transaction. That's correct, Your Honor. The trust is the entity that realizes this $60 million of benefit. And the question is, is that profit or is it a tax effect? Is it a tax item? And the reason that this 901I question is so central is that the basis for the government's argument, the economic argument, so to speak, that this BX payment of $60 million a year should be treated as a tax item, and therefore it's excluded from the calculation of pre-tax profit. Pre-tax profit only includes, both on the income side and on the expense side, those benefits. What are the non-tax effects? Is this case different from the other economic substance cases based on who it is that the IRS is attempting to disallow any refund to? I mean, in the other cases, it is the entity that receives the tax benefit that the IRS is going after. And here, Barclays, it's not within the jurisdiction of the government, so they're going after a different entity who is essentially there just to facilitate the transaction. Does that change the analysis? Well, we think it changes the analysis because in this case, as you've pointed out, if the court accepts that the $60 million is profit, then BB&T realizes no tax benefits. I mean, if you look at any of the economic substance cases in this circuit or in any other circuit, the fundamental common denominator is that the taxpayer improves their tax position. Here, what happens is BB&T now pays, in our $100 example, $22 of tax to the United Kingdom, $13 of tax to the U.S. government. It pays the exact same 35% tax it would have prior to the transaction. So its tax return, its cash-out-of-pocket tax, is identical. The only way that the government can argue that BB&T has improved its tax position is by saying that this $60 million of cash it receives from Barclays is not an economic profit to them, but in fact is a rebate of the taxes it paid to the U.K. government. So that's really the question I have. When we're looking at economic substance of a transaction as a whole, are we supposed to look at it from this broad worldview, or are we supposed to look at it from the perspective solely of the claimant in this particular case? Well, I think you look at it from the perspective of BB&T, because that is the party who, not only does the IRS have jurisdiction over, but that is the party who is involved in this transaction. So Barclays is certainly relevant here in the sense that it informs the court about the overall aspects of the transaction. And it is very relevant that the benefits that are being realized here are U.K. tax benefits. Unequivocally, Barclays is realizing substantial U.K. tax benefits by virtue of a credit and two deductions. And it is that benefit, the U.K. tax benefit, that they're passing through to BB&T. But the crucial element, and the reason this is not a rebate, is those benefits are detached from the taxes that BB&T paid to the U.K. government. So it cannot be said that there is a rebate under 901I or under economic substance. And the reason, again, for that is, if you look at the statute, not only is it the fact that it's a substance-based analysis, but look at the questions that are asked in the statute. Is the benefit that's conferred by the U.K. government, is it an benefit that's conferred by virtue of a deduction or a credit? Is it a benefit that can be provided to any party in the transaction, including Barclays? So the point is, on this narrow question, to go back to your point, Your Honor, on this narrow question of the characterization of this Barclays payment, the substance of what that payment is, whether it's a rebate or not, is established by the statute. And the IRS has conceded that BB&T complied with that statute. Now, we're not going to go over to the economic substance analysis and say, now we're going to perform a different analysis. We're going to perform a different substance analysis. We're going to ask the exact same questions, and we're going to come to the same conclusion. And this fact is particularly important in this circuit. In this circuit, it's very clear that the court will not go behind the payment of tax. This court will not ask the question about what happened in the U.K., as reflected by the Mexican Railroad cases, and that's been reaffirmed as late as the Banker's Trust decision in 2000. In those cases, what happened is this is prior to the establishment of 901I. And very importantly, the court was asked the question about whether they're going to allow a foreign tax credit in a situation where it was abundantly clear, Judge Hughes, that the counterparty, the Mexican Railroad company, was receiving a rebate of taxes. Specifically, the payment of taxes went from, well actually it didn't go from anywhere, a tax liability, a Mexican tax liability accrued to a U.S. taxpayer's counterparty. That U.S. counterparty received, my time's up? We'll let you keep going. We'll give the government some more time. Okay, thank you. That Mexican counterparty, the U.S. taxpayer, and the Mexican government signed an agreement that said, you Mexican company are going to pay us a dollar of tax. You're going to charge the U.S. company $3.40, one dollar of which is going to be taxed. And we, the Mexican government, are immediately going to rebate that money to you. There's no ambiguity, there's direct collusion. And the court was asked, under Section 901, prior to 901I's establishment, is that taxpayer, the U.S. taxpayer, entitled to a foreign tax credit? And the answer was, by this court, we are not going to examine the internal affairs of the Mexican government and how they decide to deal with their constituents. And the bottom line was that the court determined that the taxpayer was entitled to a foreign tax credit, notwithstanding the fact that 100% of the money had been rebated. And bankers' trust involved a situation where the regulation that we're dealing with today, substantially the regulation we're dealing with today, had been established by the Department of Treasury. And the court still said, unless there's a statute, we are not going to overturn our earlier precedent where we're going to go into the affairs of the foreign government. So now consider, the question on the table is, was this a rebate for purposes of determining whether this amount is in or out of the income question? The government has agreed that we have complied with Section 901I. That tells you we are right back into the precedent by the predecessor to this court, in terms of the Mexican railroad car cases, and bankers' trust, this court, which said, in the absence of a specific statute, we are not going to go behind BB&T's payment to the UK government and into the affairs of the UK government. Now I know this gets into a factual question. I know this gets into UK law, and I understand your argument about the problem with looking into transactions at the UK side of the ledger. But explain to me, factually, how it is that Barclays comes up with a $100, we started with in the example, how they come up with what I guess is a $78 trading loss deduction. What is the actual loss to Barclays? Excellent question, Your Honor. But let me just say one thing about that first. What's very relevant to your question is that in the first instance, if we look at Barclays' return, the first thing that happens is Barclays reports 100% of the same income that BB&T reported. So both BB&T, meaning the trust, and Barclays report $100 of income in the UK. And BB&T pays $22 of tax, and Barclays would have paid 30% of tax, meaning another $8. Barclays gets a credit for $22, which is why they are at $8. But this is very important, and this is why there's no rebate, because as it relates to the taxes BB&T paid, Barclays never receives any of that back. But now to get to your question. What happens is that there is, which we accept, there is a circular cash flow in the transaction, where the trust makes a distribution of the net proceeds after tax. The trust receives $100, they pay $22 to the UK government, they're left with $78. The trust makes a distribution to Barclays for the blocked account of $78, and then there's an immediate re-contribution of that $78 back to the trust. Which sounds an awful lot like a wash to me. And for US tax purposes, to go to your question, for US tax purposes, BB&T treated it as a distribution up and distribution back down. But Barclays didn't. But Barclays didn't. And why isn't it a wash? Under UK tax rules, that distribution re-contribution generates a deduction for them, and therefore allows them to reduce other... What's the reasoning underlying that? Because it sounds bizarre. Well, it may sound bizarre in this case, but in actual trading, where the asset that they have, which is a specific interest in the trust, because it is not receiving distributions off of the trust, they have to effectively reduce the value of that interest in the trust by virtue of the distribution and the re-contribution. That's why it's referred to as a trading loss. But that is very much the issue in the UK. But judge, the very important part of that is it has nothing to do with BB&T's payment of the UK taxes. Whether or not BB&T paid those taxes, BB&T could have made the distribution up to the blocked account and back down, and Barclays' entitlement to that deduction would remain the same. Which is why it's detached from the taxes paid. Okay, we need to give the government a chance here, so just to try to keep things even, we will restore your rebuttal, but we'll give the government an extra six minutes if necessary. Thank you. You don't have to use it, but unless we force you. Good morning, and may it please the Court. Let me first address the relationship between the economic substance doctrine and the technical tax rules. The technical tax rules, when they're written, are written to apply to substantive business transactions. They assume that the underlying transaction has those economic substance and business purpose. The economic substance doctrine tests that assumption. It tests that assumption by analyzing the economic reality to see if this transaction, although it may comply with all the technical tax rules, provides the taxpayer an economic benefit and was entered into for a business purpose. Those are factual questions. It's ultimately a question of the law, how you characterize it. The general characterization of a transaction is a question of law, but that characterization is not developed in a vacuum devoid of the facts. If you look at the economic substance and substantive reform cases, they're long cases because they're going through detailed analysis of the facts, as this court did in Stobie Creek, as it did in Wells Fargo, the Supreme Court in the Frank Lyon case. These are very fact-intensive cases. Okay, I'm sorry. Can I just ask you a hypothetical? Sure. All right, suppose that Barclays had gone to BB&T and said, there's some good business reason for us to have you put some property in a trust that we can claim partial ownership over. Maybe they get a loan or whatever. Barclays says to BB&T, if you put this property in a trust like this, we'll pay you X amount of dollars per year, and that's considered as income by BB&T. Would that kind of transaction have... You still have these same kind of foreign tax issues because it's in a trust cycle through the UK and the like, but the reason it's in a trust is not just for tax reasons. This also may be for other reasons. Would that be something that has economic substance? I mean, depending on the facts, but if BB&T is relying on the foreign tax credit for its economic return, it wouldn't, as a matter of US law, have economic substance. What happened here sounds different from your situation. You know, that's what I'm trying to... So here, I think the way the payments are structured from Barclays to BB&T, the BX payments, seem much closer aligned to the foreign tax credit. But there, even though... And I'm sorry, I'm not being very clear about my hypothetical, but there, you know, the trust is... It cycles through the UK, so BB&T has to pay the foreign tax and then can claim the foreign tax credit. But Barclays is giving them money unrelated to the tax credit. It doesn't use a formula based on the tax credit. It's saying, it's valuable to us for you to give us ownership of this property in a trust for other reasons. So that payment is not really connected to the foreign taxes that BB&T pays, although they're still generating income that may ultimately offset the taxes. If, in fact, the transaction was not artificial and, say, for example, BB&T transferred assets to the UK for Barclays to use, and its return was not coming back from Barclays claiming tax credits for tax that BB&T had paid, that transaction may have economic substance, but that is not the transaction here. As the court found, the transaction... So I guess the question I have, and this is where I find this a little puzzling, is what kind of difference is there in terms of what BB&T cares about, whether they're helping Barclays get a loan or something, business purpose, or they're helping Barclays reduce their UK tax burden. Either way, Barclays is getting something of value from BB&T, and they're willing to pay them for it. But the difference in this case is this is not a UK tax shelter. This is a US tax shelter. The UK came out ahead in this case. It's tax additive for the UK. The US government is the entity that lost, and the court found this. The entire transaction was funded by the foreign tax credits. That is an unchallenged finding. It's recorded in the record. We discuss it on page 6 and 45 and 46 of our brief. That's why... What happens in this case is BB&T obtains a dollar of foreign tax credit for 50 cents of cost, and that's allowed it to tell its board that STARS provided it positive tax benefits. Well, this is an issue on which you and Mr. Maiden are clearly at loggerheads, and he says that the BX payment does not ultimately derive from the foreign tax credit. In other words, they're not reaping the... To take the $100 example, which is useful here, I think, he's saying it's not the $22 foreign tax credit that generates the $11 BX payment. It sounds like what he's saying, when you take the transaction apart, it looks like the most immediate source of the $11 is the $78, the $78 deduction that Barclays gets from the UK government. Explain to me how it is that I should conclude that you're right and he's not. Two points. When Barclays presented this to the UK to get pre-approval before... Let me just add a little more to my question. It does appear that the immediate source of the $11 is the $78 deduction, because without that $78 deduction, Barclays is in a lost position, correct? Barclays needed both the credit and the loss. That's the testimony in the case. Okay, explain that to me so that I can see the connection that you're making between the original $22 of BB&T's foreign tax credit and the $11 payment. What BB&T told the UK is that you have to look at this as a whole. Taking credits or taking losses and told the UK there was not going to be any tax leakage because the tax paid by BB&T was going to be more than the benefits that Barclays was going to take. And the way Barclays promoted this transaction to BB&T was, we are going to claim tax credits for the tax that you paid and then share that tax credit with you. That's the way the parties understood it. Whether it's a credit or loss, they had to have both and money is fungible. So whether the benefit is coming mainly from the credit or mainly from the loss, Barclays needed both to be able to provide BB&T the return of BB&T's tax payment. And the parties understood that that's exactly what Barclays was doing. It was claiming the credit for the tax that was paid and returning it to BB&T, which is why BB&T internally referred to it as a rebate. And when BB&T presented this transaction to its board, it said, we're going to pay this tax that Barclays was going to claim tax credits for that tax and return it, or half of it, to us. But this is all, I mean, the UK is all happy with this, right? It's all legitimate under foreign law, correct? Well, BB&T, when it was presented as tax additive to the UK initially, it didn't analyze the transaction, didn't bother to challenge it. Its sources are scarce, and that's the way that it works. But once the UK started to understand this more in 2005, it actually sent a letter to the United States and said, you might want to take a look at this STARS transaction. It creates artificial tax credits and appears to be tax credit abuse. Once the United States got that letter and in fact started to look at it, it's key to understand that this is a US shelter, not a UK shelter, because it's draining the Treasury, the US Treasury, not the UK Treasury. Whose perspective are we supposed to look at the economic substance question from? We are looking at it from the point of view of BB&T. And BB&T had no economic reason for engaging in the trust transaction. The only thing that it obtained was foreign tax. We have to look at net impact, foreign tax, and a return of half of its tax fee. But that's if we define the VX payments to be a rebate, right? It is, but even if... You have to win that point. No, that's not accurate, Your Honor, because even if you think, even if you reverse the, or disagree with the Court of Federal Claims' factual findings supported by the evidence, including BB&T's own characterization of the VX as a rebate, if you view it as economic income, it's still just 50% of what it had to pay to get that income. I mean, look at their story. It doesn't make any sense. We took on additional UK tax so that we could get half of it back. If you view the VX as economic revenue, you have to view the UK tax as a cost of obtaining that revenue. And that transaction is not profitable until BB&T files its federal tax return and gets the foreign tax credit. If you say, build me a house, I'll give you $100, I can't determine whether that's going to be a profitable transaction until I know how much it's going to cost me. Corporations take into account foreign tax credits all the time with respect to their bottom line profitability, don't they? Sure. And there's nothing improper about that. Absolutely not. In this case, what makes it improper is that there's nothing else. BB&T took pre-existing U.S. income from U.S. assets, circulated it through a trust in an overnight transaction that generated nothing, no positive economic benefit for that income or those assets other than the foreign tax credit in return of the tax payment. Whether you view that as a rebate, as supported fully by the evidence in this case, or as economic income, it's still only half of its U.K. tax cost. Do you agree with Mr. Maiden that the analysis of this overall transaction should be segregated into both, on the one hand, the trust aspect of the transaction and on the other hand, the loan aspect of the transaction? Yes, we do. And that's what the court found because the loan was artificially taxed to the trust to conceal the transaction. But it's not a single unitary integrated transaction as far as you're concerned for analytical purposes. No, no. Turning to the loan for a moment, I just want to understand exactly what your argument is with respect to those. This is a loan which is above what we'll argue is the market rate. But nonetheless, there's no question that it's interest that was charged on the loan that was paid. That's correct. Right. Why isn't that enough to satisfy the requirements of the loan deduction statute and why isn't that, since the loan is being used for economic purposes, why isn't that enough to satisfy the economic purpose? And let me give you an example of what's concerning me here. Suppose that I have an option to get a home mortgage and I could get it at, whatever it is these days, 4.5%, but my brother-in-law is a loan officer at a small struggling bank and I decide, you know what, I'm going to throw some business in my brother-in-law's direction so I'll go to his bank and they charge me an extra quarter of a percent. I say, I can deal with it. Surely the IRS wouldn't regard my loan as not subject to deduction. Of course not. All right. What is different about this case? You have a non-tax reason for engaging in that loan. And under this court's case law or predecessor, the Rothschild case, where real interest was paid on a loan, the court, that's not enough. That's not enough to entitle a taxpayer. But it sounds like you're bringing the other part of the transaction back into the loan part of the transaction when you start to talk about the tax reasons for the decisions that are made with respect to the loan. Only in the sense that if you look at BB&T's purpose for engaging in this loan, it was an illegitimate tax-related purpose which was to conceal the trust, to give it a purported low-cost business purpose that was rejected by the taxpayer. But as Justice Breyerson just said, isn't that inconsistent with your position that these are two separate transactions and that you can't put them together for purposes of analyzing economic substance? I don't think so. Because I think, as the Court of Federal Claims explained, it's looking at it separately, but realizing that BB&T had tried to put them together artificially to conceal the two. And the court, when it analyzed the economic reality, the economic reality is that they were separate, but you're still left with a loan that was engaged in for no purpose other than... But isn't the economic substance analysis supposed to be done, at least under this court's case law, from a purely objective standpoint? The court looks at both. And in Sobey Creek, the court noted that if a transaction will be disregarded for tax purposes, one or two things happen. If, objectively, it lacks any economic benefit or substantial economic benefit for the taxpayer, or subjectively, whether the taxpayer lacks a business purpose. There'll be a lot of overlap sometimes in the factual analysis. You'll have to test the taxpayer's purported business purpose against objective realities. But the court still looks at subjective evidence such as how the case was promoted to the taxpayer, what the taxpayer's understanding of the transaction was. In here, this case was promoted as a foreign tax credit trade. And the taxpayer's understanding was that the BX payment was a rebate and that understood that the loan and the trust connection was wholly artificial and that the taxpayer was embedding the BX within the formula for the loan in order to disguise the fact that it was a rebate. Where do we draw the line in your analysis in terms of deciding when payments between private parties constitute rebates? I mean, the law clearly says that a rebate comes from a foreign government. So, I mean, you don't dispute that, right? The statute specifically says a rebate has to be from the foreign government. The law does not say that. What the law says, and this is 901I, is that if the taxpayer receives a rebate from the foreign government, directly or indirectly, that that's going to limit the foreign tax credit. But that only applies in a transaction that has substance. What the economic substance transaction looks at is as an economic matter, is this a rebate. So we're not arguing that this is a rebate legally. We're arguing that it's an economic matter, it's a rebate, and just the common sense term of a rebate is a return of funds. As the taxpayer, you know, can see the child, that's what a rebate is, as an economic matter. 901I was not designed to address every situation. It was designed to address one situation, and that's in a transaction that actually has economic substance. The economic substance doctrine has a different purpose, and that's to prevent transactions that are abusive, where the economic reality doesn't reflect the form, which is the case here. Let me return briefly to the loan aspect of the transaction again. Supposing my hypothetical, my brother-in-law, if you recall hypothetical, my brother-in-law doesn't keep the extra quarter percent, but he hands it back to me in cash. Now, that's setting aside the criminal problem. I suppose that I would clearly not be able to deduct the full amount of the interest because I'd gotten a quarter percent back, but wouldn't I still be able to deduct the rest of the part that is actually bona fide interest? Even though the transaction is obviously tainted by this conduct, but nonetheless, I'm still paying real interest on a real loan for the rest of it. Part of it is in-depth. I think in your hypothetical, putting criminal law aside, the transaction would be analyzed under the substance of reform doctrine, and that loan would be re-characterized at the lower rate, and in that case, you don't disregard the entire transaction, you'd be entitled to your interest. So why isn't that this case? Because the loan lacks a non-tax purpose. But doesn't it have a non-tax purpose? This loan is being used for all sorts of investments of a billion and a half dollars, which is available to the borrower to use, and presumably was used, for all sorts of legitimate purposes. There's no suggestion that the billion and a half was somehow not a legitimate loan proceeds, right? No, but as the trial court found, the use of the loan proceeds was not an incremental benefit from the STARS transaction, and that's an unchallenged finding. It's supported by BB&T's contemporaneous analysis. They did analyze what they were going to do with the loan proceeds. They analyzed just the loan's rate and how it would be lower if they applied the rebates they're getting back from the UK for it. But this loan was above market in the minute that the STARS trust transaction ended, and it ended early when the IRS issued the proposed anti-STARS regulations. BB&T didn't try to hold on to the financing from Barclays because it was an undesirable loan that hindered any investment. It was a drag on any investment that could actually use the loan proceeds for, because this is a loan at LIBOR plus 25, and it could borrow funds at LIBOR minus 18 basis points, I believe is what the testimony was. One brief comment on penalties. With regard to penalties, the only penalty issue that's on appeal is whether BB&T had reasonable cause for its tax underpayment. And penalties are critical to the self-enforcing tax system because they're designed to deter taxpayers, particularly taxpayers who, you know, repeat tax shelter purchasers like BB&T, designed to deter them from entering into these types of transactions and to let other taxpayers who are paying their fair share of the tax know that those who do not are going to pay a penalty. And we've detailed in our brief a number of reasons of why the trial court correctly found that BB&T lacked reasonable cause. They failed to obtain independent tax advice. The advice that they did obtain was based on false factual representations regarding BB&T's motives for engaging in the transaction. BB&T was a sophisticated bank. We're not talking about somebody taking out a small loan. We're talking about a sophisticated bank... Go ahead. I just want to have a question when you finish your question. Okay. Almost done. They were fully aware of the tax risk and, finally, they visited that prior experience with the 37 lilas and silos that were rejected by the IRS under the substance actions for BB&T engaged in the STARS transaction. Now, between the parties, there's some back-and-forth about Sidley's participation in the whole thing and particularly Mr. Rubel's... aptly named Mr. Rubel. His involvement in this whole STARS matter and the advice that was given. Can you help me out and factually walk me through briefly the involvement in the opinion-granting and the conflict of interest to, for lack of a better term, situation of Sidney as you see it? Sure. Well, Sidley drafted and Mr. Rubel is the primary drafter of the tax opinion that BB&T is relying on. But, Sidley was recommended you know, this wasn't just independent counsel that BB&T went out and got it was actually recommended by both Barclays and KPMG. But he wasn't the person that ultimately gave the final opinion, right? He was going by that, if I understand correctly. I'm not sure that's the case. Clearly, Sidley said that they stood by the opinion even after he was gone. After he was gone. After BB&T got the opinion, shortly after that it became quite public that KPMG and Sidley in particular Mr. Rubel were under investigation for bad tax activity. That was an unrelated transaction, right? I mean, it developed to be but what was in the press was that these are organizations that develop and sell tax shelters. But that didn't ring a bell for BB&T to go out and get independent tax advice somewhere it should have been a red flag that Barclays, their counterpart in this case was recommending Sidley. But even putting aside the fact that Sidley was not independent tax advice, the actual tax advice that Sidley provided was insufficient to provide reasonable cause because it was based on factual representations that BB&T knew or should have done were false regarding its motives for engaging in this transaction. Any other questions? Thank you. Thank you. Thank you. I've got two points to make but let me just clarify the response for the question you asked. Mr. Rubel was at Sidley when the initial opinion was issued to BB&T in 2002 and he was a primary drafter. The information about his participation in tax shelters didn't emerge until 2003, well into 2003 and when that occurred BB&T went back to the head of tax Sidley and their corporate tax lawyer and at that time Sidley had a three person tax team including the head of tax re-review the analysis and affirmed for BB&T that they stood behind the tax opinion. And the issues were unrelated. You mean the different tax shelter structures? It was more like the Scobie Creek transaction. And other. The two points I want to make. One Judge Bryson goes back to what you asked in the context of the loan interest deduction. If you have an inflated loan interest rate it shouldn't be the case that you at least get the difference between the market rate and the inflated rate. Well that goes directly into the argument we're making with respect to the foreign tax credit issues also. In this sense when Judge O'Malley asked me whether I'm using 901I and the Coltec decision as a vehicle for the answer is in some instances absolutely yes. If you consider that if the actual statute 901 applied to this case and there was a rebate a statutory rebate only half or 51% of BB&T's foreign tax credits would have been disallowed.  specifically says to the extent of a rebate and when it comes to statutory construction and using economic substance what economic substance does here is go well beyond the remedy that would have been pursued by the statute if we had failed the statute. That can't be the case. It can't be the case that the statute reaches a different result and economic substance makes matters worse. If you look at the banker's trust case in fact, when the IRS attempted to invoke this very regulation against banker's relating to a Brazilian foreign tax credit where there was clearly a rebate they only sought back in our case the 51% not the 49%. I mention that because that should be the worst case scenario for BB&T but I also mention it because of everything else we've talked about which is once you're in 901I then you should look at the 49% in the context of the substance analysis that is required by that statute. That's point one. Am I over? Yes, but you can just make your last point. Thank you. My last point is this argument about 901I and these BX payments are not rebates are not the exclusive basis for our position that the BX payments should be treated as economic income. The only two courts of appeals that have addressed the application of in the context of economic substance the application of economic substance in the context of foreign tax credits are the 5th and 8th circuit in Compact and IES and in that case those are also the only two cases that have addressed the question of what income should be included and not included and in those cases number one, both circuits decided that that was a question of law and both courts decided that even though the payment made by those taxpayers' counterparties fulfilled their tax obligation that payment was still, excuse me, that amount was still income for purposes of pre-tax profit. Here we have a direct payment. Thank you. Thank you.